(No. 6171. January 18, 1936.)

SEAFOAM MINES CORPORATION, a Corporation, Appellant, v. RUSSELL VAUGHN, Respondent.

[53 Pac. (2d) 1166.]

J. G. Hedrick, for Appellant.

344

A. F. James, for Respondent.

ON REHEARING.

GIVENS, C. J.—Respondent claimed a lien under I. C. A., sec. 44–705,[1] on all the personal property situated on certain

[1] Liens for services on or caring for property.—Every person who, while lawfully in possession of an article of personal property, renders any service to the owner thereof, by labor, or skill, employed for the protection, improvement, safekeeping, or carriage thereof, has a special lien thereon, dependent on possession, for the compensation, if any, which is due him from the .owner,. for such. service. Livery or boarding or feed stable proprietors, and persons pasturing livestock of any kind, have a lien, dependent. on possession, for their

mining claims belonging to appellant. Appellant sought herein an accounting, return of and an injunction to restrain respondent from removing the personal property sold by him under foreclosure of his lien on appellant's contention that respondent never had such possession of the property as to entitle him to a lien and that his foreclosure thereof was premature. And while appellant makes numerous specifications of error, it has summarized them in these main contentions:

"First. That as the respondent was a mere watchman or servant for hire, he never had a lien on the property in question under the provisions of Section 44–705, *supra,* as he was never in the actual exclusive possession of the property such as is required by the provisions of the said Statute.

"Second. That, admitting that the respondent did have a lien on the said property he sold it before the sixty days had expired after his money was due or after he quit work, as provided in Section 44–705, *supra,* and the sale was, therefore, void and of no effect."

The evidence discloses without dispute that respondent was employed by Sidney Carr, superintendent of appellant corporation since 1927, with the approval of Mr. Hungerman, president of appellant company. Mr. Carr's duties as superintendent were to manage the property and act as purchasing agent, but during all of the period involved herein, though he lived in Idaho, he visited the mine but twice—once in July and again September 3d and 5th in 1932, when he was

compensation in caring for, boarding, feeding or pasturing such livestock. If the liens as herein provided are not paid within sixty days after the work is done, service rendered, or feed or pasturing supplied, the person in whose favor such special lien is created may proceed to sell the property at public auction, after giving ten days' public notice of the sale by advertising in some newspaper published in the county where such property is situated, or if there be no newspaper published in the county then by posting notices of the sale in three of the most public places in the county, for ten days previous to such sale. The proceeds of the sale must be applied to the discharge of the lien and costs; the remainder, if any, must be paid over to the owner.

fishing most of that time, otherwise he was not on the property from November 1, 1931, to September 1, 1932. Respondent claimed a lien for his services from November, 1931, to October, 1932, and there is no evidence to show that Mr. Hungerman or any other officer or employee of the company other than Mr. Carr and respondent were at or on the premises during such period of time.

Mr. Hungerman testified that respondent was employed first as a laborer; then, as operator of the power plant, and after operations were suspended at the mine in September of 1929, to look after and care for the personal property of the company under the supervision and direction of Mr. Carr.

Mr. Carr testified that respondent was employed for the period of time in question as caretaker or watchman. Respondent himself testified on cross-examination under the statute that he was employed as watchman, and when examined on his own behalf that he was employed as watchman, and his wife testified that he was employed in "looking after the property." His duties consisting, without real dispute, in clearing the snow off the buildings in the winter and keeping people from going on the property or injuring or molesting it.

The trial court found in favor of respondent and denied the injunction and respondent in support thereof relies on *Idaho Comstock Min. & Mill. Co. v. Lundstrum*, 9 Ida. 257, 74 Pac. 975, and *Williamson v. Moore*, 10 Ida. 749, 80 Pac. 227. Appellant urges that *Mendilie v. Snell*, 22 Ida. 663, 127 Pac. 550, 42 L. R. A., N. S., 731, has in effect overruled such decisions and that to continue the rule as stated in the two previous decisions would unduly and injuriously extend lien rights.

The statute states:

"Every person who, while lawfully in possession of an article of personal property, renders any service to the owner thereof, by labor, . . . . , employed for the protection, . . . . safe keeping . . . . thereof, has a special lien thereon. . . . ."

In the Mendilie case, *supra*, the court held a sheepherder had no lien on the sheep he was herding under this statute,

relying for such holding on cases from Oklahoma, Washington and Montana, so construing a similar statute, and distinguished as inapplicable the holding in the Lundstrum and Williamson cases, *supra,* on the ground that there was a difference in the possession, stating that the facts in the Lundstrum case disclosed "that Lundstrum was placed in charge of certain personal property on a mining claim as keeper and watchman, and that he had the sole and exclusive custody and possession of the property for a long period of time," and "that what constituted a sufficient possession to satisfy the requirements of the statute was not considered or discussed," nevertheless in the Lundstrum case the court said there were two questions involved: "First, was Lundstrum placed in possession of the property by a party authorized to do so? Second, if so was he entitled to a lien on the property for his services in caring for and looking after the property?" Lundstrum was placed in charge of the property by Phelps, general manager, and it is not shown in the record there or here that a general manager had more authority than a superintendent and president. The authority of employment, therefore, in the instant case would seem to be as great as in the Lundstrum case.

Lundstrum testified that:

" . . . . Mr. Phelps agreed to pay me $3.00 per day or $2.00 per day and board *for taking care of it.* . . . . "

and while he testified that he was in possession of the property and respondent herein did not so testify, as pointed out in *McDearmid v. Foster,* 14 Or. 417, 12 Pac. 813, at 816, cited by appellant, testimony that a party "has possession" is only a conclusion of law, and "whether he had possession or not must depend upon the facts and circumstances surrounding the affair." Lundstrum further testified that he was told by the original owner of the mine and the Camas Prairie Bank, who were securing the property by mortgage foreclosure, that the property was good for his pay, but the court did not base their conclusion that he had a lien on any special agreement arising from such testimony, but based it on the general ground of possession, which they said was

clearly shown. Lundstrum further testified that his duties were "to look out for the property and protect it," "to look out for the personal property," and the appellant herein does not dispute the physical facts as to what respondent was to do or what he did do at or in connection with the property. It does assert that the legal relationship flowing from the work performed by him did not give him a lien, but Hungerman himself testified that Vaughn was engaged "to look after" and "care for the personal property," and what legal difference is there between this and Lundstrum's testimony that he was to "look out for the property" and "protect it." It is to be noted that both in the Lundstrum case, *supra*, and herein, the liens considered attach only to personal property.

The appellant has never disputed or denied that it owed respondent wages for the period in question. The record shows that Hungerman received this wire sent July 22, 1932:

"Money must be in Stanley August 1, Final.

"RUSSELL VAUGHN."

Evidently in response to this letter Hungerman wrote respondent July 24, 1932, as follows:

"Dear Rus—

"Rec'd your wire Friday night when I came home late— To be frank with you have been expecting something like this on account of our delay in settling with you and can't blame or find any fault with you.

"Wrote Sid several times and thought he would explain matters with you as I understood from him that he would go to Camp early in June, otherwise would have written you. . . . . "

the balance of the letter is with regard to difficulties in securing money and general difficult financial conditions, but the portion quoted is sufficient to show that the company recognized the debt due respondent without any question. Then on July 23, 1932, Hungerman wrote Carr in part as follows:

" . . . . You failed to state anything in your letter as to how Rus feels towards us. We owe him nine months salary and he may be peeved about it, but it can't be helped. We

intend to pay him same as you and everybody, when we can get our money. I know Rus needs and wants whats coming to him but he will have to be patient a little longer. Maybe he don't know that labor is in ample supply at .15 per hour and you have to produce to hold the job, even on the $6,000,000 church the Mellons are building here and by sub-contractors for public work.

"The following wire was waiting for me when I got home late Friday evening.

" 'Ketchum, July 22, 1932—Call.

" 'MONEY MUST BE IN STANLEY AUGUST FIRST FINAL.

" 'RUSSELL VAUGHN.'

"This will be impossible as the closed banks will not mail out checks till August 1st and they come from the Girard Trust Co. Philadelphia. You can check this up from enclosed clipping published yesterday.

"Russ has been patient and I don't blame him for hollering but he should realize our position, all moneys tied up and no jobs or earning makes living tough and paying bills out of the question till we get some funds.

"Am making special efforts with some of our friends to try to get at least some to pay Rus part on the account and forward to him promptly if I succeed. I feel sure Rus does not know that you cannot borrow a dollar on $100,000 worth of clear real estate from the banks while those that hid their money in socks are picking up bargains in homes that are being sold Sherriff Sale for Taxes; these shylocks would not loan a dime to save a person from starving.

"I trust you will understand our position, helpless like the most of all folks, till some relief comes when everything will be straightened out, I hope.

"Sincerely yours,"

And on August 15th, 1932, the company wrote as follows:
"Russell Vaughn,

"Stanley, Id.

"Dear Rus. Rec'd your letter of Aug 3d I showed it to the Directors I was able to meet and they agree that you are right and your claim fair and just. . . . . "

The balance of the letter is with regard to sending $173.60 and a request for a statement.

If respondent was not as much in possession of the personal property herein involved during the period for which he claims a lien as Lundstrum was, then nobody was. So far as possession is concerned there is no valid or legal distinction between respondent's position herein and Lundstrum's condition which, however, as indicated in *Mendilie v. Snell, supra,* is readily distinguishable from the possession of sheep by a sheepherder, but we do not express any opinion as to any other situation than the one involved immediately herein.

Appellant further contends that the lien was prematurely foreclosed because 60 days had not elapsed between the time the work was done or service rendered and the foreclosure. As shown by the telegram quoted above, demand was made on July 22d, and so recognized by appellant. Respondent served written notice of intention to sell upon appellant September 8, 1932, and likewise advertised the sale to take place on September 26, 1932. The lien was dependent on possession, so respondent had to continue in possession until foreclosure. Appellant contends that the statute is to be construed as giving a lien for the services rendered for a period ending seventy days prior to the sale, on the other hand respondent in effect takes the position that during such period, respondent's possession is of a dual nature, for himself to protect and enforce his lien, and at the same time in possession for the party against whom the lien is sought and the owner of the property, so as to be entitled to lienable wages therefor and cites authority which tends to sustain his position. (*Folsom v. Barrett,* 180 Mass. 439, 62 N. E. 723, 91 Am. St. 320.) The court there considered the question now before us and also its aspect as amounting to an excessive claim, one of appellant's contentions here. The above case was decided under a statute similar to our statute and though it was for keeping a horse, the principle involved would be the same. The court said:

"That being so, the further question remains whether the plaintiff can hold the defendant personally liable for the

expense incurred after the demand. At common law, a lienor not only had the right to keep the object of the lien, but he could do nothing else with it if he desired to maintain his lien. If he lost possession, he lost his lien; if he sold, he was guilty of conversion; and, although there is now quite generally some statutory provision for a sale, still there can be no doubt that in this state it is optional with the lienor whether to enforce his lien under the statute or under the common law. The plaintiff kept the horse, as he had a right to keep it, and he kept it for the defendant—that is to say, he kept it so that when the sum due was paid, the horse could be delivered up. In keeping the horse, the plaintiff was performing a duty he owned to the defendant, which was to keep the horse for him. The horse must be fed or die, and both parties knew that. It does not appear that the defendant ever relieved the plaintiff from that duty by giving him to understand that the original contract by which the charge of keeping was to be at the defendant's expense was necessarily ended by the plaintiff's refusal to give up the horse unless the bill was paid, or that he never should discharge the lien. For aught that appears to the contrary, the defendant may have acquiesced in the position of the plaintiff as reasonable and in accordance with the contract. If he intended to revoke the contract for board, he should have manifested that intent. Under these circumstances, we think that the law raises a promise on the part of the defendant to pay for the expense incurred after the time of the demand. The horse was left by the defendant in the hands of the plaintiff without the latter's fault, and the plaintiff was bound to take reasonable measures for its preservation. For this expense he may hold the horse or recover against the defendant: See *Great Northern Ry. Co. v. Swaffield*, L. R. 9 Ex. 132.''

The same holding was in effect announced by this court in the Lundstrum case, *supra*, and somewhat the same principle given sanction by *Idaho Min. & Mill. Co. et al. v. Davis*, 123 Fed. 396. As indicated in *Folsom v. Barrett, supra*, the lien claimant must not only hold the property to protect and perfect his lien, but he must also hold the property in order

to return it to the owner if the claim is paid or tender made. If the lien claimant has no lien during such seventy-day period, it might, as pointed out by respondent, utterly destroy any virtue in his claim of lien in that the expense of said seventy-day period would more than offset the amount of his claim. Lien statutes are to be construed liberally and in favor of the claimant. The rule announced in *Folsom v. Barrett, supra,* therefore, would appear to be a reasonable construction of the statute whereby respondent would be entitled to a lien for his wages up until, as stated in the Lundstrum case, *supra,* he is discharged or paid. Therefore respondent could claim pay and had a lien to secure the same up to the time of the sale. Respondent was the only bidder at the sale apparently because there were back taxes on the property which the sheriff publicly declared would have to be paid before any of the property could be taken away.

It is claimed the property was worth greatly in excess of the bid, but appellant cites no authorities holding that such a situation would make the sale void or invalid.

■ The provisions of our Mechanics' and Laborers' Lien Law as well as all other lien statutes must be liberally construed with a view to effect their objects and promote justice (*Phillips v. Salmon River Mining & Development Co.,* 9 Ida. 149, 72 Pac. 886).

■■ I. C. A., sec. 44–705, makes no provision for attorney's fees which were therefore improperly included in the lien foreclosure, but we may eliminate from the proceeds of the sale to which respondent was entitled, the attorney's fees, without vitiating the sale because any balance of the sale proceeds are to be paid to the owner, and in the absence of fraud and where the excess can be segregated, as it can here, claim of excessive amount does not vitiate the lien. (*Wheatcroft v. Griffiths,* 42 Ida. 231, 245 Pac. 71; *Eskestrand v. Wunder,* 94 Mont. 57, 20 Pac. (2d) 622; *Shumway v. Woolwine,* 84 Cal. App. 220, 257 Pac. 898; *Lucas v. Gobbi,* 10 Cal. App. 648, 103 Pac. 157; *Snell v. Payne,* 115 Cal. 218, 46 Pac. 1069 (2d case).) On the argument on rehearing respondent virtually admitted the attorney's fees should be eliminated.

Appellant has cited no authority to the effect that where the claim of lien was excessive, as here, because of the inclusion of attorney's fees or other items, and the property was sold for more than enough to satisfy the legal claim, the lien claimant is thereby guilty of conversion, and inasmuch as there was only one bid and the debtor had notice of the sale and interposed no objection thereto, and it appears that all of the property had to be sold in order to satisfy the legal amount of the claim, or at least there is no showing that less than the entire amount of property would have been sufficient, the claim of conversion has not been substantiated. (*Jones v. Bartlett*, 36 Ida. 433, 211 Pac. 555.)

The sale is therefore held valid and the judgment affirmed to that extent, but the attorney's fees should be eliminated therefrom and respondent required to reimburse appellant to the extent the proceeds of the sale exceeded such reduced amount. No costs awarded.

Morgan and Holden, JJ., concur.

Budge and Ailshie, JJ., did not participate.